ERVIN

*v.*

LUCKETT'S ADM'R.

(*Supreme Court of Appeals of Virginia, September, 1872.*)

**Sale of Land—Case at Bar.**

In August, 1853, the appellee sold to the appellant a tract of land, the terms of which sale were that $10,000 of the purchase money were to be paid in hand, and the balance in four equal annual installments, with interest on the fourth deferred installment from date, for which installment the appellant executed bonds secured by deed of trust on the land. There was no cash payment on the $10,000 until several months after the sale when the appellee accepted some bonds in part payment of such hand payment. The hand payment of $10,000 however was not fully satisfied until the 5th of Nov. 1854, when on that day the parties had a partial settlement of their accounts in regard to the purchase money of the land, made by means and agency of one Porter. The settlement was not completed, and they had another meeting. Porter not being present McDannald was called on and completed the settlement. At which settlement appellee was paid $3,366.68. For which the appellee gave a receipt in these words : "$3,366.68. Received of James R. Ervin thirty-three hundred and sixty-six dollars and sixty-eight cents, in part on notes due me for purchase of land Nov. 5th, 1854" : *held,* this payment referred as well to the bonds for the hand payment of $10,000 as to the deferred installments.

The essential facts are fully stated in the opinion.

Appeal from the circuit court of Bath county.

*Wm. J. Robertson,* for appellant.

*Michie, Bell & Cochran,* for appellee.

MONCURE, J., delivered the opinion of the court.

The chief and almost the only subject of controversy in this cause is, whether the sum of money mentioned in Exhibit (A) filed with the bill, was properly applicable, as a credit, to the hand payment of ten thousand dollars, or to the bonds or some of them for the deferred payments for the tract of land sold by Dr. Francis E. Luckett to James R. Ervin, on or about the 9th day of August, 1853 ; as in the proceedings mentioned. It is maintained on behalf of the appellant, Ervin, who was the vendee, that the said credit was applicable to the said bonds for the deferred payments ; while, on the other hand, it is maintained in behalf of the appellee, Dr. Luckett, who was the vendor, that the said credit was applicable to the said hand payment, at least in the first place.

These conflicting views have been maintained by the counsel of the parties respectively in printed arguments of extraordinary ingenuity and power and it is a task of no little difficulty to decide the matter between them. We must, however, address ourselves to the task, however difficult it may be, and perform it to the best of our ability. The learned counsel for the appellant have had very heavy weight to carry along with them in making their argument. Commissioner Brooks, whose report was filed in April, 1861, and Judge Sheffey, who decided the case in the circuit court of Bath county in May, 1868, were all of opinion against the appellant, and the latter two of them strongly present at length the reasons for their opinion. Notwithstanding this disadvantage, the counsel for the appellant have certainly made a very strong case for their client by their argument. On the other hand, the learned counsel for the appellee, Dr. Luckett, have certainly made a very strong case for their client by their argument. And the office which this court has now to perform is, to decide

the matter at issue between these contending parties. The question is one of fact, almost entirely; depending upon the circumstances of the case. I have examined the record, and I read and considered the arguments on both sides very carefully and anxiously, and I have come to the conclusion that the result at which the counsel for the appellee have arrived by their argument is correct. In giving my reasons for this conclusion, it might perhaps be sufficient for me to refer to and adopt the views of the commissioners, the judge of the court below, and the counsel for the appellee, which are stronger than any I can hope to present. But as I may not be prepared to concur in all of their views, I think it best to state and rely on such of them as seem to my mind to be of themselves conclusive of the case.

The sale, as before remarked, was made in August, 1853, on or about the 9th day of the month. It was a public sale, and was conducted by James Cochran, Esq., as counsel for the vendor, Dr. Luckett. The terms of sale were, that $10,000.00 of the purchase money were to be paid in hand, and the balance in four equal annual installments, with interest on the 4th deferred installment from date, the deferred installments to be secured by deed of trust on the land. The appellant, being the highest bidder, became the purchaser at the sale, at the price of $25,375.00. The land was thereupon conveyed to the purchaser who executed bonds for the deferred installments, and a deed of trust on the land to secure their payment. Though $10,000.00 of the purchase money were to be paid in hand, according to the term of sale, yet no part of the hand payment was made in cash; and there seems to have been an understanding and agreement between the parties that the hand payment might be made in bonds. There was no payment made, even in bonds, earlier than the winter after the sale, if it can be said that such a payment was then made. Perhaps it ought to be here mentioned, by way

of explanation of the conduct of these parties and of their dealings with each other, that they were closely connected, being the husbands respectively of a mother and her daughter ; Mr. Ervin of the mother, and Dr. Luckett of the daughter.   Mr. Ervin seems to have been of ample means, though possessed of little ready money.   Dr. Luckett seems to have been a man of rather extravagant habits, and apt to spend money and go in debt ; though he expected to be able to live without expending that part of the purchase money of his land on which credit had been given at the sale ; and he seems to have led the purchaser to believe that indulgence would be given him in the payment of his bonds after they would become due.   The parties seem to have had confidence in each other and to have been worthy of such confidence.   Both no doubt were honorable men, and their controversy has arisen from mistake as to facts, and not from any intention to do wrong on the part of either.   The first step toward making the hand payment of $10,000.00 appears to have been made, as before remarked, in the winter, several months after the sale ; when the vendee appeared in the office of Cochran the attorney of the vendor and threw down a bundle of bonds, telling the attorney to look over and make a selection from them. It does not appear what bonds were in the bundle (except as to two or three of them), nor what was their amount, nor what was the condition of the obligors.   Nor does it appear what amount of these bonds was selected by the attorney, or received by the vendor.   It does appear that some of these or other bonds were afterwards received by the vendor on account of the hand payment, which however appears not to have been fully satisfied until the 5th day of November, 1854, more then a year after the sale, and about three months after the bond for the first deferred installment had become payable. On that day, the parties had a settlement, or partial settle-

ment, of their accounts in regard to the purchase money of the land, made by the means and agency of S. A. Porter, the clerk of the county court of Bath. The settlement was not then completed, in consequence of the absence of some papers, and the parties were to have another meeting in a few days, when it was expected that the settlement would be completed by the same agent. They accordingly had another meeting, but Porter not being present, they called on C. R. McDannald, who completed the settlement. On the partial settlement made by Porter, the receipt before referred to, which is the chief matter of controversy in this cause, was signed by Dr. Luckett and taken and held by Porter. It is in these words :

"$3,366.68. Received of James R. Ervin thirty-three hundred and sixty-six dollars and sixty-eight cents, in part on notes due me for purchase of land, Nov. 5th, 1854.

"F. E. Luckett."

On the completed settlement made by McDannald, a credit, as of the 5th day of November 1854, for $466.51, was endorsed on the bond for the first deferred installment, and a credit, as of the same day, for $230.63, was endorsed on the bond for the 4th deferred installment, being one years' interest due on that installment on the 9th day of August, 1854. When the partial settlement was made by Porter, the bonds for the purchase money were not present, being, it seems, in possession of Cochran, the attorney of Luckett, and of course no credit could then be endorsed upon them. When the complete settlement was made by McDannald, the receipt before mentioned was not present, being in possession of Porter, and of course could not then be delivered to Dr. Luckett, supposing him to be then entitled to it.

In behalf of Ervin it is contended, that in the partial settlement made by Porter it was ascertained that the hand payment of $10,000.00 had been fully made, and that, over and

above that amount, payments had been made to the amount of $3,366.68, for which therefor the receipt was taken from Dr. Luckett, "in part of notes due him for purchase of land," meaning the bonds for the deferred installments; that in consequence of the absence of certain papers, a full settlement could not then be made, and it was agreed that in a few days there would be a meeting of the parties, for the purpose only of settling such matters as were not settled at the first meeting; that accordingly, there was another meeting in a few days, when those matters were settled by McDannald, the result of which settlement was to endorse the credits aforesaid on the bonds for the 1st and 4th deferred installments; that the two settlements were independent of each other; and that therefore Ervin was entitled to credit on the bonds for the deferred installments, for the said sum of $3,366.68, and interest from the 5th day of November, 1854, over and above the credits he had already received on account of said bonds.

In behalf of Dr. Luckett, on the other hand, it is contended that the settlement of McDannald was but a continuation of the settlement by Porter, the two together being in effect but one settlement; that a bond had been executed for the hand payment of $10,000.00, and the receipt for $3,366.68 in part of notes due to Dr. Luckett "for purchase of land," referred, as well to the said bond for the hand payment, as to the bonds for the deferred installments of the purchase money; that the said sum of $3,366.68 was the amount of bonds and money assigned or paid on the said 5th day of November, 1854, or previously, which had not been credited on the said bond for the hand payment, and a receipt was given for the said sum, as it could not be then credited on the bonds which were not present, the said receipt being merely intended as a memorandum of the transaction until it could be closed by a final settlement; that McDannald having settled the matters which remained unsettled by Porter, adjusted the whole matter, including the said sum of $3,366.68,

by applying so much as was necessary to the payment of the balance due upon the bond for the hand payment and interest, and crediting the residue $697.14 upon the bonds for the 1st and 4th deferred installments, that is, crediting $230.63, being one years' interest due on the 9th day of August, 1854, on the bond for the 4th, and $466.51 on the bond for the 1st deferred installment; and that, therefore, Ervin was entitled to no further credit than what he had already received as aforesaid on account of the said sum of $3,366.68 or the said receipt therefor.

This is the contest between these parties ; and which of them is sustained by the evidence, is the question with which we now have to deal.

In reaching this enquiry it is important, in the first place, to ascertain if we can, whether a bond was ever given for the hand payment of $10,000.00. For if, as contended in behalf of Ervin, no such bond was ever given, that fact goes far to sustain the issue maintained in his behalf, that the said sum of $3,366.69 is applicable only to the credit of the bonds for the deferred installments ; it being expressed on the receipt for the said sum that it is "in part of *notes* due for purchase of land." Then was the bond ever given for the said hand payment? I think it clearly appears from the evidence that such a bond *was* given. James Cochran, the attorney of Dr. Luckett, who attended to the sale and prepared all the papers, expressly proves that he prepared such a bond, which was executed by Ervin on the same day on which the other papers were executed, though later in the day. It was not prepared at the same time of the day with the other bonds because Cochran expected that the hand payment would be then settled ; but not having been settled, a bond was prepared and executed for the amount, which bond was afterwards kept by Cochran with the other bonds. He states the

circumstances attending the execution of the said bond, which leave no doubt about the fact. Nothing can be more reasonably a problem than that such a bond should have been taken. A deed had been executed by Dr. Luckett, acknowledging the receipt of the whole purchase money. It was uncertain *when* the hand payment would be made ; and it was, in fact, not fully made until the 5th of November, 1854, more than a year after the sale. Cochran, the attorney, well knew the importance of taking a bond, or at least some acknowledgment in writing, to show that the hand payment was still due ; and therefore he took a bond for the amount, payable on demand or one day after date. If there be any evidence to show that such a bond was not given, it is negative evidence only and falls far short of weighing down the positive affirmative evidence of Cochran. Ervin does not deny that he executed such a bond. In answer to the calls made upon him for the production of the bond, he only says that he does not remember having executed such a bond, and at all events that if executed, it was never returned to him and was not in his possession. The testimony of Jas. W. Warwick, taken October, 1866, to show that Dr. Luckett in 1854, twelve years before, spoke of the transaction as then remaining unsettled by a bond, is entitled to little or no weight as proof of that fact. The witness, doubtless, misunderstood him, or did not well remember what he said, after so great lapse of time. The substance of what Dr. Luckett said on that occasion no doubt was, that if bonds were not soon issued in discharge of the hand payment, he would not receive it in paper, but would demand the money. I think we must therefore take it as a fact proved in the cause, that a bond was given for the hand payment.

Having disposed of this preliminary question, I will now proceed to consider the main question, viz. : As to the proper application of the credit for the $3,366.68 mentioned in the receipt marked A.

I think that the settlement made by McDannald was but a continuation and completion of the settlement made by Porter, and was not a different and independent settlement. *Porter* was to have made the last settlement as well as the first; and if he had done so, it would have been, if possible, still more manifest that the last was but a conclusion and completion of the first. But Porter happened to be absent when the parties assembled and were ready to make the last settlement, and therefore McDannald was called on by the parties to make it. Its connection with the first settlement must, however, be precisely the same as if it had, in fact, been made by Porter, as had been intended by the parties. That the credits endorsed by McDannald at the request of the parties, on the 1st and 4th deferred bonds, bear the same date with Porter's settlement, to wit: the 5th of November, 1854, is confirmative of the fact that the two settlements were but parts and parcels of one and the same settlement. Why should they have been different and independent? Is there any conceivable reason for so supposing? I think not.

Then why was not the credit for the $3,366.68 mentioned in the receipt aforesaid disposed of in the final settlement made by McDannald? Could there have been any conceivable reason for leaving that matter indefinitely open and unsettled? It was left open and unsettled by Porter obviously because none of the bonds were present, and therefore the proper credits could not then be endorsed upon them. The receipt was evidently taken as a mere memorandum of the amount of the bonds, etc., assigned on the 5th of November, 1854, and not credited on the bond for the hand payment, the parties intending to apply the proper credits to the bonds respectively when the settlement should be concluded, which was expected to be, and in fact was, in a few days thereafter, and when the bonds were expected to be, as in fact they were, present. It was known to all the parties

when the last settlement was made that a receipt had been taken on the first settlement for $3,366.68 to be applied to the credit of the notes due for the purchase of the land. Ervin and Luckett could not have forgotten so important a matter, which had transpired only a few days before ; and they must have communicated information of the fact to McDannald, in order that he might include that matter in his settlement and ascertain the proper credits to be endorsed on the bonds. That it was included in his settlement is further shown by the fact that the first settlement appears to have embraced everything between the parties, except two matters, to wit : The amounts due by Ervin to Luckett for a negro sold at the sale of the land, and an account of certain crops. These matters of course constituted debts due by Ervin to Luckett, and could not be the foundation of any credits to be endorsed on the bonds. It does not appear that any, or if any, what other new matter of account was embraced in McDannald's settlement. The presumption, therefore, is that the credits endorsed on two of the bonds by McDannald were derived from the amount mentioned in the receipt aforesaid.

There is another fact which strongly confirms the view that the $3,366.68 mentioned in the receipt were not applicable as a credit alone to the deferred bonds, but were applicable, in the first place and mainly, to the bond for the hand payment : and that is, that Ervin was not in a condition at that time to do much, if any, more than settled by an assignment of bonds or otherwise, the amount of his bond for the hand payment, and interest thereon, and the amount due to Luckett on account of the negro and crop as aforesaid. He seemed to exert all his efforts with a view to that object, and not to expect to be able to do more. Indeed it seemed to be difficult for him even to do that. He made no offer to make any assignment of bonds until several months after the sale ; and Goode's bond, which is the first in the list of his credits,

appears not to have been assigned till the 1st of April, 1854. Several, if not most, of the bonds were not assigned until the 5th of November, 1854, more than a year after the sale. James W. Warwick, one of his witnesses, proves that in the fall of 1854, he, the witness, was urged by Ervin to settle with him, he, Ervin, saying that if he did not get his, Warwick's, bond to transfer to Dr. Luckett, he, Ervin, would have to pay the money, as "the Dr. told him if he didn't get the paper immediately he wouldn't take the paper." Witness understood that it was the hand payment of $10,000.00 that Ervin had a contract to pay in paper, and on account of which he wished to obtain the bond of witness. Witness accordingly gave his bond, which was one of the bonds issued on the 5th day of November, 1854, as aforesaid. Now if the sum of $3,366.68 mentioned in the receipt aforesaid, be applicable as a credit to the deferred bonds, over and above the other credits applied to the same, then Ervin, on or before the 5th day of November, 1854, assigned bonds to Dr. Luckett to that amount, over and above what was necessary to pay the amount of the hand payment and interest, and what was due on account of the negro and crops aforesaid ; which would be inconsistent with the facts before stated.

But the subsequent conduct and dealings of Ervin in regard to his debt to Dr. Luckett for the purchase money of the land, seem to be wholly inconsistent with the pretensions now set up by the former. If the said sum of $3,366.68 had been applicable as a credit on the deferred bonds, as contended for by him, why did he not have it applied accordingly ? Was there not as much reason for having it so applied as for having the credits applied which, at his request, were endorsed by McDannald ? If he had had it applied to the first deferred bond which had become due, as he ought to have done if his pretensions had been well founded, he would have extinguished, or nearly so, the amount due

1 Va Dec—2

upon that bond, and might have taken it in and cancelled it at once, and thus relieved himself from any further demand of Dr. Luckett until the second deferred bond should become due, which would not be until the 9th of August, 1855. Can it be supposed that, pressed as he was for money, and urgent as were the demands of Dr. Luckett upon him, he would have failed to use that receipt for his protection if he could possibly have done so, as he certainly could if the pretensions he now sets up were well founded? He certainly knew of the existence of the receipt. He could not have forgotten so important a matter in so short a time, supposing the amount of it not to have been credited to him. Instead of having the amount of that receipt applied as a credit to the first deferred bond and taking in that bond, he continued afterwards, for five or six years, to deal with Dr. Luckett and his assigns precisely as if he had received all the credit to which he was entitled on account of that receipt or the money therein mentioned. On the 7th of November, 1855, he made on account of the first deferred bond two further payments, amounting together to $2,418.00, which were credited on the bond, in addition to the credit of $468.51 endorsed thereon by McDannald, on the 15th of November, 1854, as aforesaid, and afterwards he seems to have paid the balance appearing to be due upon the bond taking it in. He executed new bonds from time to time for interest as it accrued on the other deferred bonds and part of the principal, and paid the same, and made other payments on account of the other said deferred bonds. On the 8th of August, 1858, the third deferred bond was assigned to McCormick, and on the 12th of August, 1859, the second deferred bond was assigned to Ludwell Luckett; and Ervin never set up any off-set against either of these assignees, but recognized his liability to both and made payments to them from time to time. In a letter from Ervin and Luckett, dated June 17,

1858, the writer, among other things, says:   "I will make
a proposition to you.   If you can borrow as much money
in Philadelphia as will answer your present purpose at 15
per cent. (which is McCormick's terms), I will pay you the
per cent. with pleasure, until I can dispose of my negroes,
which I expect to do as soon as Mr. Poindexter comes on to
the Healing from Mississippi."   "I am laboring as hard and
exerting myself as much as any man living to pay my debts.
Had it not been for the derangement in bank, all would
have been right.   My stock of cattle is worth $10,000.00
at this time, etc."   "I know I ought to be very prompt in
paying you, and would be so if I was not disappointed
myself in my arrangements.   I am very thankful to you
for your indulgence, and I hope, after I dispose of my ne-
groes and get a return from my cattle this fall that there
will not be any further disappointment between you and
me about any of our business."   There are also in the
record, several letters from Ervin and Ludwell Luckett,
dated in the latter part of 1859, promising to make pay-
ment on account of the bonds assigned to the latter and
stating excuses for not paying the money sooner.   And it
appears not to have been until after that period that Ervin
set up any claim on account of receipt A.   To be sure
Porter, in his deposition taken January 9th, 1861, says :
"Mr. Ervin said to me some *two or three years ago*, that he
was satisfied that Dr. Luckett had failed to give him any
credit for the receipt A, and wanted to know from me
whether it was necessary for him then to demand a credit
to be placed on some of his bonds for the amount, and if
not, whether it would be good in a final settlement.   And I
told him to take care of the receipt, and if Luckett had
placed no credit on any of the bonds, it would stand good,
with interest, in a final settlement.   I think this was after
he had lifted the bond of August '54 and found no credit on
it for the amount."   He could not have expected to find

the amount credited on that bond, for it would nearly if not entirely have paid it in full; whereas he afterwards made large payments on account of that bond, which of course he would not have done if the bond had already been paid or nearly so.    Two or three years before that deposition was taken would be before January 9th, 1859.    But this vague reference to date is very unreliable, and it is not probable that Ervin had any idea of setting up any claim to a credit on account of the receipt earlier than December, 1859, which appears to have been the date of his last letter to Tazewell Luckett.    At all events he did not actually set up such claim until after that date.    I think, from all the evidence in the case, that this receipt, which after the settlement made by McDannald was handed by Porter to Ervin, was laid aside by Ervin as a paper of no further consequence, and was lost sight of by him until late in 1859, or early in 1860, when, being again discovered by him, and he (having forgotten all about it) supposing that he had never received credit for it, therefore then determined to claim such credit, and accordingly did so.    But he did so in such a way as implied a doubt in his own mind whether he was entitled to it or not.

I have stated, I believe, the principal circumstances which concur in tending to show that Ervin is not entitled to the credit he now claims on account of the said receipt, and certainly they make out a very strong case against him. I will now proceed to consider the grounds on which he relies to counteract the force of the evidence against him.

The testimony chiefly relied on to sustain his case is that of Porter, McDannald, W. D. Ervin and W. H. Terrill.

I do not think that the testimony of these four witnesses is sufficient to outweigh the testimony on the other side. All of them testified from memory, as to occurrences which happened many years before they gave their testimony, and

they had evidently forgotten, almost entirely, all that they
ever knew on the subject to which their testimony relates.
Porter, the most important witness for the plaintiff, was his
partner in business, and naturally had a strong leaning in
his favor.   He admits that but for two things he would
probably not have recollected any of the particulars of the
transaction; and yet it is difficult to see how these two things
could have had such an important effect in refreshing his
mind as to those particulars.   One of these two things was,
that he had in his possession the statement made at the time of
the settlement for some months thereafter; and yet he says
that he does know that he ever examined the statement
after it was made, though he saw it frequently as it lay in
his drawer ; has no distinct recollection about it ; considered
it a paper of no value, and threw it in his drawer, where he
supposes he saw it frequently; thought the whole matter set-
tled between the parties; presumes it has been lost or mis-
laid ; had it in his possession for some time after the settle-
ment, but thinking it of no value, threw it aside ; has
looked for it since, but can't find it ; it is either lost or was
burnt, as he burnt a good many old papers when he left the
office.   I cannot conceive how the mere possession of such
a paper for such a period and under such circumstances,
without ever having once examined it after throwing it in
his drawer as a paper of no value, could have had any effect
in refreshing his memory about the particulars of the settle-
ment.   The other of these two things was, the conversation
which he says he had with McDannald after the settlement,
as to the amount paid by Ervin on the land, in which con-
versation he said to McDannald that Ervin had paid all but
*ten or twelve* thousand dollars of the purchase money.   His
memory was certainly very vague and imperfect as to the
amount which he said remained unpaid.   But it seems from
James Cochran's deposition, that Porter at one time had a
a very different recollection on the subject.   After the land

was advertised by the trustee under the deed of trust, Cochran had a conversation with Porter in reference to the result of the settlement made by himself and McDannald, between Dr. L. & E., in which conversation Porter said he understood the result of the settlement commenced by himself and completed afterwards by McDannald, liquidated the hand payment, the bond for the negro, and Luckett's interest in the crop, and left a credit for the first deferred bond; which was precisely what was claimed by Dr. L. It is strange that the witness Porter with his imperfect memory, refreshed only by such trivial circumstances, should have been able to recollect and state as he does in his deposition, the particular bonds which were mentioned in the settlement, made more than six years before. In his enumeration of these bonds he says: "I think there were several bonds on John W. Frazier, amounts of which I don't recollect." Now it appears that no bond of John W. Frazier was ever assigned by E. to L., or was included in the settlement aforesaid. It is stated in a note of Commissioner Brooks, included in the record, that "from an examination of the original papers it appears that Wm. Frazier, administrator of John W. Frazier, took up the bonds of John W. Frazier, deceased, held by Mr. Ervin on the 15th of June, 1854, and executed his bond to Mr. Ervin for them amounting to $600.49, on that day ; that on the 16th of October, 1854, Mr. Ervin collected $100.00 on this bond, and that on the 26th May, 1855, he transferred the residue of the bond to Dr. Luckett." Commissioner Brooks returned with his report a statement marked S of all the payments which the plaintiff attempted to prove, made up to November 5th, 1854, and that statement does not embrace any bond of Frazier. The probability is that Porter, being a partner of, and no doubt very intimate with, Ervin, had often heard him speak of assigning certain bonds to Dr. L., some of which may, and others may not have been

afterwards assigned, and when Porter gave his deposition
in the case, he thought he remembered that such bonds were
actually included in the settlement.    But I have said enough
in regard to this witness, and will now take some, though
less notice of the remaining three.

McDannald remembered little or nothing about the set-
tlement made by him, except (as was said in the argument)
about the quantity of paper used in making it, which he says
was little over three-fourths of a page of foolscap.    He could
not say whether or not the $10,000.00 was before him when
he made the settlement, or whether or not the amount called
for by said bond was embraced in said settlement.    Nor
could he recollect any of the items that Ervin was credited
with in said settlement.    He said that he heard Porter speak
of the amount that Ervin had paid Dr. Luckett several times
during the time they (Porter and McDannald) roomed
together, but he did not remember the dates, though it was
previous to Porter's marriage, which was in May, 1856, and
that he, Ervin, had paid him, Luckett, *some 13 to $14,000.00.*
This is certainly very indefinite, both as to time and amount,
and there is nothing in it at all inconsistent with what is
contended for in behalf of Dr. Luckett.    The witness fur-
ther said that the credit endorsed upon the note in his hand-
writing was done by the direction of the parties, and he
understood from them that he was called upon to make the
settlement because of the absence of Porter.

W. R. Ervin is a son of the plaintiff, and was about 17
years old in August, 1853.    He testified as to the bonds, etc.,
which were assigned by his father to Dr. L. ; but his testi-
mony is very vague, and he obviously had little personal
knowledge on the subject.    He was not present when they
were assigned, but said he knew the understanding between
his father and Dr. L. was that the latter was to take them.
He knew they were intended and kept for the purpose, and
that his father left home to transfer them to him.    He spoke

of John Frazier's bond as one of those that were to be assigned, and thought it was for about $1,000.00. Now it appears, as before stated, that Frazier's bond or the balance due upon it, was not more than about half that sum, and that the bond was not in fact assigned, at least in discharge of the hand payment. His evidence also tends to show that his father had some difficulty in making up the necessary amount of suitable claims to be assigned in discharge of the hand payment, and that it is not probable he succeeded in making up much more than enough for that purpose. If the plaintiff's pretensions be well founded, he must have made up, not only enough for that purpose, but also enough to make up the amount of the receipt, taken by Porter, to wit: $3,366.69, and also the amount credited on the first and fourth deferred bonds by McDannald, to wit : $466.51 and $230.63, equal to $697.14, and making, with the amount of the receipt, an excess of $4,063.82 over and above the amount of the hand payment, besides what was due on account of the negro girl and the crop. The witness spoke of an interest which his father had in an estate in Monroe, supposed to be worth $2,500.00, which he wished Dr. L. to take in part of the hand payment ; but the Dr. declined doing so, and afterwards his father lifted the bond to Robert Johnson, and put that in place of the interest in the Monroe estate, as it was about the same amount.

W. H. Tenell had been the attorney of Dr. L. in collecting money for him from Ervin on account of the purchase money of the land ; but ceased to be so about the time of, or before the institution of this suit. In his first deposition, taken by the plaintiff on the 11th of March, 1861, he testified as to a meeting and conversation of the parties in his office in the spring of 1860, about the matter in controversy between them. But he said there was no settlement, nor even an attempt at a settlement, on that occasion, between them. Mr. Ervin then enumerated the different bonds he

claimed to have assigned to Dr. Luckett in discharge of the
hand payment, which bonds, as listed at the time, the wit-
ness says "exceeded the sum of $10,000.00 *something con-
siderably*," though he did not look at the figures themselves.
He says Dr. L. made no objections to the statement of said
bonds, except one, he thinks Jacob Warwick's, which had
been returned, amounting to some 7 or $800.00.   Mr. Ervin
admitted that that bond had been returned, but witness says
there was still left an amount beyond the $10,000.00.   There
seems to be nothing in this deposition at all inconsistent
with the defendant's pretensions.   The witness speaks very
vaguely of the amount of the bonds claimed to have been
assigned by Ervin, and it might have been "considerably"
over $10,000.00, and yet not have exceeded the amount due
by him to Dr. Luckett on account of the hand payment, the
negro girl and the crop, and the sums credited by Mc-
Dannald on the first and fourth deferred bonds.

But in the examination of this witness on the 15th of Oc-
tober, 1866, more than five years after his first deposition
was taken, and more than six years after the meeting of the
parties in his office in the spring of 1860, referred to in his
first deposition, he was asked by the plaintiff's counsel to
examine certain statements, which were shown to him at the
time and are annexed to his deposition, and to state whether
they were made by him, and if so, to state all he knew in
regard to their preparation, and whether the parties were
present at the time they were made ; and he answers :   "I
have examined the statements referred to in the question.
They are in my handwriting.   When they were shown to
me on Saturday last, I had no distinct recollection of the
circumstances or of the purpose under and for which these
statements were made.   I have endeavored to refresh my
memory in relation to them and am now satisfied that they
were made at the instance and with the assent of both
Francis E. Luckett and James R. Ervin, with a view of

ascertaining how the account then stood between the said parties in relation to the purchase money of the land sold by Luckett to Ervin." After referring to some palpable errors on the face of these statements, the witness said : "I am of the opinion, though not positive, that when I made the above-mentioned statements, I furnished each party with a copy. The one now before me I had not seen after it was made, until Saturday last, when it was shown to me by Gov. Letcher, one of the counsel for the plaintiff. The foregoing answer is made upon my best recollection of the circumstances detailed after the lapse of six years from the date of their occurrence.'' In the statement referred to by the witness and annexed to his deposition the amount of the receipt of the 5th of November, 1854, is credited to the deferred bonds, according to the pretensions of the plaintiff, and if Dr. Luckett assented to it, as the witness seems to think he did, then he surrendered the whole question of controversy between him and Mr. Ervin. The conflict between the first and last depositions of this witness is most palpable and glaring, and I am satisfied that his first deposition in the main is correct and the latter unfounded in all material respects. Of course I have the utmost confidence in Mr. Tenell's veracity, and believe that any mistakes he may have made in his last examination proceeded entirely from a defect of memory. But his last deposition is so much in conflict with his first, given more than five years before, and when the transaction to which he testified was recent and fresh in his mind, and is so much at war with all the probabilities of the case, that I feel sure that he must have been mistaken in giving it. I think it quite likely that the statement here referred to was made out by Mr. Tenell after he ceased to be the attorney of Dr. Luckett, and was made out at the instance and according to the views of Mr. Ervin, and handed to him ; that he used it, or his counsel used it, in the preparation of his bill ;

that he afterwards kept it until it was produced on the last examination of Mr. Tenell as before stated ; and that Mr. Tenell, after endeavoring to refresh his memory on the subject of the statement, not having before seen it since he wrote it, came at length to an erroneous conclusion about it, which is set forth in his last deposition. When that deposition was taken Dr. Luckett was dead. Had he been alive and then present, he could doubtless have brought things to the mind of Mr. Tenell which would have satisfied him of his mistake.

I have noticed, I believe, all the material testimony relied on by the plaintiff to disprove the case made out in behalf of the defendant, and I am of opinion that it is insufficient for that purpose, and that the plaintiff is entitled to no further credit on account of the receipt aforesaid than was given him by McDannald in the settlement made by him, and this disposes of the chief subject of controversy in this case.

I am therefore of opinion that the circuit court did not err in overruling the plaintiff's exceptions to Commissioner Hendren's report.

As to the other matters complained of in the petition of appeal, viz. :   1st, in regard to $30.06, claimed to have been paid on the 9th day of August, 1856, as interest on the bond for $501.26, and not to have been credited by Commissioner Hendren, as it ought to have been ; 2dly, in regard to the credit given by him only for $461.26, instead of $501.26 ; 3dly, in regard to the payments alleged to have been made of the two bonds of Andrew Damron, and of $400.00 on the 11th day of March, 1861, in part of the Yates' claim ; and 4thly, in regard to the credit given only for $1,500.00 instead of $2,000.00 claimed to have been paid by W. D. Ervin for the plaintiff, J. R. Ervin, to Francis E. Luckett in the fall of 1855, at the same time that the Benton note for $918.00 was transferred ; I am of opinion that

although these matters were not subject to any exception to the said commissioner's report nor any motion in the court below for a recommitment of the said report, yet as there was evidence in the record concerning them, or some of them, when the said decree was pronounced, taken about the time when the said report was filed and which was not before the commissioner (to which evidence there was no exception), it would have been proper for the court, under all the circumstances of the case, instead of confirming the entire report, to have recommitted it to the commissioner for further enquiry and report as to the other matters complained of as aforesaid, and to have confirmed it only in all other respects.

I am therefore of opinion (without now intending to express any opinion upon any of the other matters complained of as aforesaid) that so much of the decree appealed from as is in conflict with the foregoing opinion ought to be reversed and annulled, and that the residue thereof be affirmed, with costs to the appellee, Adam G. Clarke, sheriff of the county of Bath, and as such administrator of said Francis E. Luckett, as the party substantially prevailing ; and that the cause ought to be recommitted to the circuit court for further proceedings to be had therein to a final decree, in conformity with the foregoing opinion.